FILED

7-24-12

JUL 2 4 2012

JUDGE CONLON

MAGISTRATE JUDGE GILBERT.

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

THOMAS G. BRUTON
CLERK, U.S. DISTRICT COURT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | No. **12 CR 567** |
| | ) | |
| v. | ) | Violations: Title 18, United States Code, |
| | ) | Sections 1001, 1341, 1343, and 2. |
| WILLIAM MASTRO, | ) | |
| DOUG ALLEN, | ) | **RECEIVED** |
| MARK THEOTIKOS, and | ) | |
| WILLIAM BOEHM | ) | JUL 2 4 2012 |

MICHAEL T. MASON
UNITED STATES MAGISTRATE JUDGE
UNITED STATES DISTRICT COURT

## COUNT ONE

The SPECIAL FEBRUARY 2011-1 GRAND JURY charges:

1.     At times material to this indictment:

a.     Mastro Auctions, which previously operated under the names Mastro Fine Sports and Mastro Net (collectively referred to as "Mastro Auctions"), was an auction house that specialized in sports memorabilia and Americana items, but also featured items such as coins, art, and other collectibles in its auctions. Most items sold through Mastro Auctions were consigned to Mastro Auctions for sale by their owners, but at times Mastro Auctions sold items owned by Mastro Auctions. Mastro Auctions advertised itself as the "world's leading Sports and Americana auction house" with "an established history of setting auction records and bringing the best collectibles to public auction."

b.     Between 2001 and February 2009, Mastro Auctions' main offices were located, at different times, in various suburbs in the Northern District of Illinois, including Oak Brook, Willowbrook, and Burr Ridge.

c. Mastro Auctions held auctions several times each year. Mastro Auctions primarily conducted online auctions, but at times conducted live auctions. Mastro Auctions advertised itself as "an industry innovator" for online auctions.

d. Prior to each auction, Mastro Auctions' employees obtained consignments from individuals who wished to sell their items in Mastro Auctions' auctions. Consignors typically were required to pay a fee to Mastro Auctions for selling their items. This fee usually was a percentage of the price that an item sold for at auction, and was referred to as a "seller's fee" or a "commission." Mastro Auctions often entered into consignment agreements with consignors.

e. In order to be granted bidding privileges in certain Mastro Auctions' auctions, potential bidders were required to pay a fee. Once a potential bidder paid a one-time $75 fee to Mastro Auctions, the bidder was permitted to place bids in future auctions.

f. Prior to each auction, Mastro Auctions produced catalogs which depicted and described the items consigned for sale in the auction.

i. In each auction catalog, Mastro Auctions set out "Terms and Conditions of Sale," along with other representations, which governed the auctions. Each Mastro Auctions catalog stated that "placing a bid constitutes express acceptance of all terms and provisions contained in these conditions of sale."

ii. Catalogs for each auction were delivered to potential bidders via the United States mail, United Parcel Service, and/or Federal Express.

-2-

g.      During Mastro Auctions' online auctions, bidders placed bids online, though Mastro Auctions' website, or by directly communicating with a Mastro Auctions employee, typically by telephone or facsimile.

i.      Bidders were able to place either a "straight bid" or a "ceiling bid." A straight bid represented a bid at the next incremental value above the last bid on a particular item up for auction. By placing a ceiling bid, the bidder, in effect, instructed Mastro Auctions to competitively bid, according to established increments, on the bidder's behalf until the ceiling bid value was reached.

ii.     The value of the highest bid for each lot at the close of the auction was referred to by Mastro Auctions as the "hammer price."

iii.    In order to purchase an item, winning bidders were required to pay Mastro Auctions a fee, called a "buyer's premium," in addition to the hammer price. The buyer's premium was calculated as a percentage of the hammer price, and ranged between approximately 15% to 22% of the hammer price.

h.      Many Mastro Auctions customers were active traders of the categories of collectibles sold through Mastro Auctions, and at various times were both bidders on and consignors of items through Mastro Auctions.

i.      "Shill bids" were fictitious bids placed without the intent to win the item, but for the purpose of artificially inflating the price of an item in the auction.

## Defendants and Co-schemers

2.  Defendant WILLIAM MASTRO was the owner of Mastro Auctions until approximately 2004.  Between approximately 1996 and February 2009, MASTRO served as the Chairman and Chief Executive Officer of Mastro Auctions.

3.  Between approximately 2001 and February 2009, defendant DOUG ALLEN served as the President and Chief Operating Officer of Mastro Auctions.

4.  Between approximately 1996 and February 2009, defendant MARK THEOTIKOS was employed by Mastro Auctions, serving as the Vice President of Auction Operations and later as the Vice President of Acquisitions.

5.  Co-Schemer A was employed by Mastro Auctions and was responsible for reconciling the accounting records following each auction.

## The Scheme to Defraud

6.  Beginning no later than in or about 2001 and continuing until approximately February 2009, at Oak Brook, Willowbrook, and Burr Ridge, in the Northern District of Illinois, Eastern Division, and elsewhere:

> WILLIAM MASTRO,
> DOUG ALLEN, and
> MARK THEOTIKOS,

defendants herein, along with Co-schemer A, certain consignors, other auction house employees, and others known and unknown to the Grand Jury, knowingly devised and intended to devise, and participated in, a scheme and artifice to defraud the customers of Mastro Auctions, and to obtain money and property by means of materially false and

-4-

fraudulent pretenses, representations, promises and material omissions, which scheme is further described below.

## Overview of the Scheme

7. It was part of the scheme that defendants and their co-schemers knowingly made, and caused to be made, materially false and fraudulent representations and material omissions in Mastro Auctions' catalogs, advertising, promotions, and other media, and in the bids placed in certain auctions. The defendants and their co-schemers intended to deceive bidders into believing that Mastro Auctions conducted auctions according to practices that ensured fair and competitive auctions and that applied equally to all auction participants, and further intended to deceive auction participants into believing that greater market demand existed for items sold by Mastro Auctions than actually was the case. In fact, defendants and their co-schemers engaged in a series of practices designed to fraudulently inflate prices paid by bidders and protect the interests of consignors and sellers at the expense of bidders. In addition, defendants MASTRO and ALLEN caused the sale of certain items whose authenticity and condition they knew to have been misrepresented to customers.

## Materially False and Fraudulent
## Representations Regarding Conduct of Auctions

8. It was further part of the scheme that defendants made, and caused to be made, the following materially false and fraudulent statements, among others, regarding the manner in which Mastro Auctions' auctions were conducted:

a.    Each Mastro Auctions catalog represented that "items are sold to the highest bidder." In fact, as defendants MASTRO, ALLEN, and THEOTIKOS knew, certain items were not sold to the highest bidder because defendants canceled sales and engaged in and facilitated shill bidding to fraudulently inflate prices to the detriment of bidders.

b.    Consignment agreements entered into by consignors and Mastro Auctions stated that a consignor, or agent of the consignor, was prohibited from bidding on an item tendered to Mastro Auctions by the consignor. The consignment agreements stated that if the consignor violated this provision and had the highest bid on an item or lot, the consignor would be required to pay Mastro Auctions the commission and buyer's premium on the item or lot upon which the consignor was the highest bidder. The consignment agreements further stated that there were no exceptions to this provision. In fact, as MASTRO, ALLEN, and THEOTIKOS knew, defendants knowingly permitted certain consignors to bid on their own items, and at times those consignors did not pay commissions or premiums when they placed the highest bid.

c.    Mastro Auctions catalogs, and defendants and their co-schemers, represented at various times that Mastro Auctions did not implement undisclosed "reserves," meaning prices, not disclosed to bidders, at which Mastro Auctions would not sell an item if the bidding failed to reach the "reserve" price. In fact, in certain auctions, defendants canceled sales instead of allowing the highest bidder to purchase

-6-

an item, in order to prevent the consignor from selling the item at a price lower than the consignor desired. The false statements about "reserves" included:

i.     Mastro Auctions' catalogs for auctions held in October 2004, February 2005, June 2005, October 2005, February 2006, June 2006, October 2006, February 2007, June 2007, and October 2007, stated that these auctions were "NO RESERVE" auctions;

ii.     No later than August 2007, Mastro Auctions made, and caused to be made, a promotional video advertising Mastro Auctions' 2007 live auction event in Cleveland, Ohio. In the promotional video, defendant ALLEN represented that items in the auction were going to sell "without reserve, the way we have conducted every Mastro Auction since our inception;" and

iii.     Defendants and their co-schemers told, and directed others to tell, consignors, bidders and potential customers that Mastro Auctions conducted "no reserve" auctions.

d.     On or about February 24, 2008, defendant ALLEN posted a statement on an Internet website frequented by consignors and bidders of Mastro Auctions in which he represented that:

i.     Mastro Auctions had never instituted a reserve when selling a sports card or sports memorabilia;

ii.     When an associate of a consignor won an item because of a shill bid, that person paid the buyer's premium similar to other customers;

-7-

      iii.    Defendant ALLEN was not aware of Mastro Auctions having returned an item to a consignor after a bid was accepted in an auction; and

      iv.    If a consignor had a [baseball] card returned following an auction, the consignor paid the buyer's premium and did not get an advantage over another bidder.

In fact, as ALLEN knew, certain consignors and shill bidders won items and the sales were canceled at ALLEN's direction and returned to the consignor, at times without the payment of fees.

      e.    In approximately October 2007, defendant ALLEN created, and caused to be created, a "Code of Conduct" for Mastro Auctions, which defendants caused to be distributed to bidders, including in the October 2007 Mastro Auctions' Classic Collector Auction catalog. The Code of Conduct stated, in part, that:

      i.    Mastro Auctions would disclose in its catalogs which items were owned by Mastro Auctions' employees, authenticators, the corporate entity and other third party affiliates;

      ii.    With the exception of one designated administrative employee, who would not be allowed to bid in the auction, Mastro Auctions' employees did not have access to ceiling bids;

      iii.    "Related parties," considered to be Auction House employees, the corporate entity, and all third party affiliates (authenticators, service providers, etc.), were prohibited from bidding on each other's consigned items.

In fact, as defendants knew, after October 2007, Mastro Auctions frequently did not disclose true ownership of items, several employees with bidding privileges (including MASTRO and ALLEN) had access to ceiling bids, and employees (including MASTRO and ALLEN) bid on items consigned by related parties.

### Fraudulent Auction Practices

9.      It was further part of the scheme that, contrary to the representations described above regarding practices that purportedly ensured that auctions conducted by Mastro Auctions would be conducted fairly for bidders, and that bidders would have a chance to obtain auction items at competitive market prices, defendants knowingly engaged in the following practices and took the following actions, among others, to cause bidders in certain auctions to pay inflated prices and to protect the interests of consignors and sellers at the expense of bidders:

a.      Defendants and their co-schemers placed, and caused to be placed, shill bids for the purpose of artificially inflating the price of an item in the auction;

b.      Defendants and their co-schemers placed, and caused to be placed, shill bids using bidding accounts that were not registered to the person placing the bid;

c.      Defendant MASTRO used a bidding account in the name of a fictitious individual to place shill bids;

d.      Defendants placed, and caused to be placed, shill bids using Mastro Auctions' corporate bidding account, their own personal accounts, and accounts of employees and friends. For example:

i.      Beginning no later than in or about 2001 and continuing until at least in or about December 2008, defendant MASTRO placed shill bids, and caused others to place shill bids, using several accounts, including defendant MASTRO's account, a fictitious account, Mastro Auctions' corporate bidding account, employee accounts, and accounts in the names of defendant MASTRO's family members, a priest, and others.

ii.      Beginning no later than in or about 2001 and continuing until at least in or about February 2009, defendant ALLEN placed and caused others to place shill bids, using several accounts, including defendant ALLEN's account, Mastro Auctions' corporate bidding account, the accounts of Owner A and others.

iii.      Beginning no later than in or about 2007 and continuing until in or about February 2009, defendant THEOTIKOS placed shill bids using Mastro Auctions' corporate bidding account.

e.      Defendants and their co-schemers ensured that when a shill bid was the highest bid at the end of an auction, that item would not be purchased by the shill bidder. Instead, defendants and their co-schemers canceled the sale of the item or offered it to the next-highest bidder.

f.      Defendants and their co-schemers knowingly permitted certain consignors to place bids on the consignors' own items, using shill bidding accounts belonging to nominees of these consignors to fraudulently inflate the sale price of those items.

-10-

g.    Defendants facilitated certain consignors' use of shill bids by taking the following actions, among others, when a consignor's shill bid was the winning bid for an item:

i.    Directing Mastro Auctions employees to return the auction item to the consignor, rather than delivering it to the consignor's nominee who had "won" the auction;

ii.    At times waiving any fees due to Mastro Auctions, including the hammer price, buyer's premium, and seller's fee; and

iii.    When fees were imposed, causing the consignors, not the consignor's nominees in whose names the winning bids were submitted, to pay the fees associated with the transaction, and directing Mastro Auctions employees, including Co-Schemer A, to modify Mastro Auctions' records to charge the consignor, not the consignor's nominee, with fees associated with the purported sale of the auction item.

h.    Defendants MASTRO and ALLEN, their co-schemers, Mastro Auctions' employees, and others had access to ceiling bid information, despite representations made in the Code of Conduct that only one "administrative employee" had access to ceiling bid information.

i.    Defendants and their co-schemers used, and caused others to use, information about the ceiling bids of certain customers to drive up the bids of those customers, by causing bids to be placed below the customers' ceiling bids, knowing full well that defendants' bids would be topped and they would not be the high bidder on

-11-

an item because the bidding system automatically executed a bid on behalf of the legitimate bidder, who had placed a ceiling bid, up to the set amount.

j.     Defendants and their co-schemers caused Mastro Auctions to decline to sell items to winning bidders in auctions in which Mastro Auctions had represented that there were no reserves. After such auctions closed, defendants directed Co-Schemer A to adjust Mastro Auctions' internal records to reflect that the sale was a "no sale" or had been canceled. In some instances, defendants caused the auction items to be returned to the consignor without charging any fees. Other times, defendants caused the items to be placed in later auctions.

k.     After the Code of Conduct was published, defendants failed to disclose that Mastro Auctions owned certain lots offered for sale in Mastro Auctions' auctions.

l.     After the Code of Conduct was published, defendants placed bids, and caused other Mastro Auctions employees to place bids, on auction items owned by Mastro Auctions.

**False Representations Regarding Authenticity and Condition of Items**

10.     It was further part of the scheme that:

a.     The Code of Conduct promulgated by in 2007 made the following representations, among others, regarding Mastro Auctions' practices concerning disclosure of information that items sold at its auctions had been altered or restored:

-12-

        i.     If Mastro Auctions believed or had knowledge that an item has been altered in any way, that information would be fully disclosed in the auction catalog.

        ii.     When, on occasion, Mastro Auctions had items restored in order to improve their presentation, the extent and nature of any restoration would be fully disclosed.

        iii.     Under no circumstances would Mastro Auctions have restoration work done on trading cards.

        b.     After the Code of Conduct was published:

        i.     Defendants MASTRO, ALLEN, and others knowingly did not disclose to bidders material information about alterations of items sold by Mastro Auctions.

        ii.     Defendants MASTRO, ALLEN and others knowingly did not disclose to bidders the extent and nature of restoration work performed on items sold by Mastro Auctions.

        iii.     Defendants MASTRO and ALLEN, along with others associated with Mastro Auctions, caused restoration work to be done on trading cards sold by Mastro Auctions, and knowingly failed to disclose that work to bidders.

        11.     It was further part of the scheme that in marketing materials distributed on behalf of Mastro Auctions, which were intended to portray Mastro Auctions to potential bidders and consignors as a premier seller of valuable items for which a strong market existed, defendant MASTRO represented that Mastro Auctions had sold

-13-

the most expensive baseball card in the world, a Honus Wagner T-206 card. In making this representation, however, defendant MASTRO knowingly omitted the material fact that defendant MASTRO had altered the baseball card by cutting the sides of the card in a manner that, if disclosed, would have significantly reduced the value of the card.

12.     It was further part of the scheme that defendants MASTRO and ALLEN offered for sale items whose authenticity they knew to be materially misrepresented, including the following:

### Elvis Presley's Hair

a.     On or about April 28, 2003, Mastro Auctions sold what it represented to be the hair of Elvis Presley ("the Purported Elvis Hair"). As a result of DNA testing performed on the Purported Elvis Hair after this sale, the authenticity of the item was called into question. In or about June 2004, after defendant ALLEN learned of the DNA testing, ALLEN provided a refund to the purchasers of the Purported Elvis Hair, and Mastro Auctions became the owner of the Purported Elvis Hair.

b.     In or about December 2005, August 2006, April 2007, and August 2008, defendant ALLEN sold, and caused to be sold, portions of the Purported Elvis Hair to Mastro Auction bidders. ALLEN knowingly caused false representations and material omissions to be made in each of the respective Auction House catalogs concerning the authenticity of the Purported Elvis Hair. For example, the Auction House represented that the Elvis Hair was "bona fide," that it would be sold with

"documents attesting to the veracity" of the Elvis Hair, and that "short of comparing mitochondrial DNA with that of known Presley relatives, the hair . . . is . . . authentic."

### 1869 Cincinnati Red Stockings Trophy Baseball

c.      In or around August 2002, Mastro Auctions sold what it represented to bidders as an 1869 Cincinnati Red Stockings trophy baseball to Purchaser A. At the time of the auction, Mastro Auctions had an ownership interest in the trophy ball. The 1869 Cincinnati Red Stockings Trophy Baseball was described, in part, as an actual game ball played with by the first professional team, decorated following the game, and presented to the winning team for display in the clubhouse. In or around October 2006, Purchaser A submitted the trophy ball to a laboratory for testing, the results of which indicated that the paint on the trophy ball contained a material not used in commercial paint until after World War II, thus calling into question the authenticity of the trophy ball.  In or around November 2006, after defendant ALLEN learned of the laboratory results, ALLEN provided a refund to Purchaser A, and the trophy ball was returned to Mastro Auctions.

d.      In or about December 2006, defendant MASTRO contacted Victim A, and told Victim A that a lone 1869 trophy ball that was associated with a collection of trophy balls that Victim A had purchased from Mastro Auctions in or around August 2003 was available for sale.  As MASTRO well knew, the trophy ball he offered to Victim A was the same trophy ball that had been returned by Purchaser A due to concerns regarding its authenticity. MASTRO omitted this material information when he knowingly failed to inform Victim A about the laboratory results calling into

-15-

question the authenticity of the trophy ball. On or about December 27, 2006, Victim A purchased the trophy ball from Mastro Auctions for approximately $62,000.

## Concealment of the Scheme

13.    It was further part of the scheme that defendants and their co-schemers misrepresented, concealed and hid, and caused to be misrepresented, concealed and hidden, the purposes of and acts done in furtherance of the scheme. In particular:

a.    At the close of each auction, defendants caused "Auction Results" to be made available to customers, in which they falsely represented inflated auction results by stating that items had actually sold, when in fact, as defendants well knew, some of the items had not been sold at auction.

b.    Defendants caused materially false press releases to be issued following the auctions, which contained statements concerning auction sales that defendants knew were materially false, including representations that certain items had been sold, when, as defendants well knew, those items had not been sold.

c.    Prior to July 2007, Mastro Auctions' bidding records were partially deleted and destroyed.

14.     On or about December 14, 2002, at Oak Brook, in the Northern District of Illinois, Eastern Division,

WILLIAM MASTRO,

defendant herein, for the purpose of executing the aforesaid scheme, did knowingly cause to be placed in an authorized depository for mail matter, to be sent and delivered by the Postal Service, an envelope addressed to Victim B, at an address in Greenwich, Connecticut, containing an invoice reflecting the sale of a book titled "Base-ball – How to Become a Player";

In violation of Title 18, United States Code, Sections 1341 and 2.

## COUNT TWO

The SPECIAL FEBRUARY 2011-1 GRAND JURY further charges:

1.      The allegations of paragraphs 1 through 13 of Count One of this indictment are hereby realleged and incorporated herein as if fully set forth.

2.      On or about September 27, 2007, at Burr Ridge, in the Northern District of Illinois, Eastern Division,

DOUG ALLEN,

defendant herein, for the purpose of executing the aforesaid scheme, did knowingly cause to be delivered by commercial interstate carrier, Federal Express, confirmation number 942346291755, from Mastro Auctions, in Burr Ridge, Illinois, according to the directions thereon, a package containing 1911 T205 Gold Border baseball cards, addressed to Victim C at an address in Narberth, Pennsylvania;

In violation of Title 18, United States Code, Sections 1341 and 2.

## COUNT THREE

The SPECIAL FEBRUARY 2011-1 GRAND JURY further charges:

1.     The allegations of paragraphs 1 through 13 of Count One of this indictment are hereby realleged and incorporated herein as if fully set forth.

2.     On or about September 28, 2007, at Burr Ridge, in the Northern District of Illinois, Eastern Division,

DOUG ALLEN and
MARK THEOTIKOS,

defendants herein, for the purpose of executing the aforesaid scheme, did knowingly cause to be delivered by commercial interstate carrier, UPS Next Day Air, confirmation number 1Z0207490101958312, from Dartmouth Printing, at 69 Lyme Road, in Hanover, New Hampshire, according to the directions thereon, a package addressed to Mastro Auctions, containing September/October 2007 Classic Collector catalogs, at an address in Burr Ridge, Illinois;

In violation of Title 18, United States Code, Sections 1341 and 2.

## COUNT FOUR

The SPECIAL FEBRUARY 2011-1 GRAND JURY further charges:

1.      The allegations of paragraphs 1 through 13 of Count One of this indictment are hereby realleged and incorporated herein as if fully set forth.

2.      On or about October 26, 2007, at Burr Ridge, in the Northern District of Illinois, Eastern Division,

DOUG ALLEN and
MARK THEOTIKOS,

defendants herein, for the purpose of executing the aforesaid scheme, did knowingly cause to be transmitted by means of wire communication in interstate commerce certain wirings, signs, signals, and sounds, namely, an electronic mail message from the Northern District of Illinois to an electronic mail server located in California, said message containing a list of auction lots to be returned to a consignor following the October 2007 Auction;

In violation of Title 18, United States Code, Sections 1343 and 2.

## COUNT FIVE

The SPECIAL FEBRUARY 2011-1 GRAND JURY further charges:

1.    The allegations of paragraphs 1 through 13 of Count One of this indictment are hereby realleged and incorporated herein as if fully set forth.

2.    On or about November 16, 2007, at Burr Ridge, in the Northern District of Illinois, Eastern Division,

DOUG ALLEN and
MARK THEOTIKOS,

defendants herein, for the purpose of executing the aforesaid scheme, did knowingly cause to be delivered by commercial interstate carrier, FedEx Ground, confirmation number 37639110023169, from Dartmouth Printing at 69 Lyme Road, in Hanover, New Hampshire, according to the directions thereon, a package addressed to Mastro Auctions, containing November/December 2007 Connoisseur catalogs, at an address in Burr Ridge, Illinois;

In violation of Title 18, United States Code, Sections 1341 and 2.

## COUNT SIX

The SPECIAL FEBRUARY 2011-1 GRAND JURY further charges:

1.     The allegations of paragraphs 1 through 13 of Count One of this indictment are hereby realleged and incorporated herein as if fully set forth.

2.     On or about December 17, 2007, at Burr Ridge, in the Northern District of Illinois, Eastern Division,

DOUG ALLEN and
MARK THEOTIKOS,

defendants herein, for the purpose of executing the aforesaid scheme, did knowingly cause to be placed in an authorized depository for mail matter, to be sent and delivered by the Postal Service, an envelope addressed to Victim D, at an address in Tampa, Florida, containing an invoice reflecting the sale of 1971 Topps baseball cards;

In violation of Title 18, United States Code, Sections 1341 and 2.

## COUNT SEVEN

The SPECIAL FEBRUARY 2011-1 GRAND JURY further charges:

1.     The allegations of paragraphs 1 through 13 of Count One of this indictment are hereby realleged and incorporated herein as if fully set forth.

2.     On or about December 17, 2007, at Burr Ridge, in the Northern District of Illinois, Eastern Division,

### DOUG ALLEN,

defendant herein, for the purpose of executing the aforesaid scheme, did knowingly cause to be placed in an authorized depository for mail matter, to be sent and delivered by the Postal Service, an envelope addressed to Individual A, at an address in New York, New York, containing an invoice reflecting the sale of a circa 1950 "Snappy Novelty Cards" vending machine;

In violation of Title 18, United States Code, Sections 1341 and 2.

-23-

## COUNT EIGHT

The SPECIAL FEBRUARY 2011-1 GRAND JURY further charges:

1.      The allegations of paragraphs 1 through 13 of Count One of this indictment are hereby realleged and incorporated herein as if fully set forth.

2.      On or about April 7, 2008, at Burr Ridge, in the Northern District of Illinois, Eastern Division,

### DOUG ALLEN,

defendant herein, for the purpose of executing the aforesaid scheme, did knowingly cause to be delivered by commercial interstate carrier, Federal Express 2 day delivery, confirmation number 954248801908, from Dartmouth Printing, at 69 Lyme Road, in Hanover, New Hampshire, according to the directions thereon, a package addressed to Mastronet, Inc, containing Mastro Sports/Americana April 2008 catalogs, at an address in Burr Ridge, Illinois;

In violation of Title 18, United States Code, Sections 1341 and 2.

## COUNT NINE

The SPECIAL FEBRUARY 2011-1 GRAND JURY further charges:

1.     The allegations of paragraphs 1 through 13 of Count One of this indictment are hereby realleged and incorporated herein as if fully set forth.

2.     On or about April 30, 2008, at Burr Ridge, in the Northern District of Illinois, Eastern Division,

DOUG ALLEN and
MARK THEOTIKOS,

defendants herein, for the purpose of executing the aforesaid scheme, did knowingly cause to be placed in an authorized depository for mail matter, to be sent and delivered by the Postal Service, an envelope addressed to Individual B, at an address in Brownstown, Michigan, containing an invoice reflecting the sale of lot numbers 578, 583, 585, 587, 588, 595 and 596, which represented baseball cards sold by Mastro Auctions during the April 2008 Auction;

In violation of Title 18, United States Code, Sections 1341 and 2.

## COUNT TEN

The SPECIAL FEBRUARY 2011-1 GRAND JURY further charges:

1.     The allegations of paragraphs 1 through 13 of Count One of this indictment are hereby realleged and incorporated herein as if fully set forth.

2.     On or about May 5, 2008, at Burr Ridge, in the Northern District of Illinois, Eastern Division,

### DOUG ALLEN,

defendant herein, for the purpose of executing the aforesaid scheme, did knowingly cause to be transmitted by means of wire communication in interstate commerce certain wirings, signs, signals, and sounds, namely, an electronic mail message from the Northern District of Illinois to an electronic mail server located in Virginia, said message containing a "revised invoice";

In violation of Title 18, United States Code, Sections 1343 and 2.

## COUNT ELEVEN

The SPECIAL FEBRUARY 2011-1 GRAND JURY further charges:

1.    The allegations of paragraphs 1 through 13 of Count One of this indictment are hereby realleged and incorporated herein as if fully set forth.

2.    On or about July 31, 2008, at Burr Ridge, in the Northern District of Illinois, Eastern Division,

DOUG ALLEN,

defendant herein, for the purpose of executing the aforesaid scheme, did knowingly cause to be delivered by commercial interstate carrier, Federal Express, 2 day delivery, confirmation number 978865361527, from Dartmouth Printing at 69 Lyme Road, in Hanover, New Hampshire, according to the directions thereon, a package addressed to Mastro Auctions, Inc., containing Sports and Americana August 2008 catalogs, at an address in Burr Ridge, Illinois;

In violation of Title 18, United States Code, Sections 1341 and 2.

## COUNT TWELVE

The SPECIAL FEBRUARY 2011-1 GRAND JURY further charges:

1.      The allegations of paragraphs 1 through 13 of Count One of this indictment are hereby realleged and incorporated herein as if fully set forth.

2.      On or about August 31, 2008, at Burr Ridge, in the Northern District of Illinois, Eastern Division,

DOUG ALLEN and
MARK THEOTIKOS,

defendants herein, for the purpose of executing the aforesaid scheme, did knowingly cause to be placed in an authorized depository for mail matter, to be sent and delivered by the Postal Service, an envelope addressed to Victim E, at an address in Akron, Ohio, containing an invoice reflecting the sale of unopened 1969 Topps baseball cards;

In violation of Title 18, United States Code, Sections 1341 and 2.

## COUNT THIRTEEN

The SPECIAL FEBRUARY 2011-1 GRAND JURY further charges:

1.     The allegations of paragraphs 1 through 13 of Count One of this indictment are hereby realleged and incorporated herein as if fully set forth.

2.     On or about November 24, 2008, at Burr Ridge, in the Northern District of Illinois, Eastern Division,

### DOUG ALLEN,

defendant herein, for the purpose of executing the aforesaid scheme, did knowingly cause to be delivered by Federal Express, 2 day delivery, confirmation number 978865393809, from Dartmouth Printing at 69 Lyme Road, in Hanover, New Hampshire, according to the directions thereon, a package addressed to Mastro Auctions, Inc., containing Sports and Americana December 2008 catalogs, at an address in Burr Ridge, Illinois;

In violation of Title 18, United States Code, Sections 1341 and 2.

## COUNT FOURTEEN

The SPECIAL FEBRUARY 2011-1 GRAND JURY further charges:

1. The allegations of paragraphs 1 through 13 of Count One of this indictment are hereby realleged and incorporated herein as if fully set forth.

2. On or about December 18, 2008, at Burr Ridge, in the Northern District of Illinois, Eastern Division,

### DOUG ALLEN,

defendant herein, for the purpose of executing the aforesaid scheme, did knowingly cause to be transmitted by means of wire communication in interstate commerce certain wirings, signs, signals, and sounds, namely, an electronic mail message from the Northern District of Illinois to an electronic mail server located in Georgia, said message from DOUG ALLEN to the consignor stating, "I will hit it one more time and let it go . . . cool";

In violation of Title 18, United States Code, Sections 1343 and 2.

## COUNT FIFTEEN

The SPECIAL FEBRUARY 2011-1 GRAND JURY further charges:

1.     The allegations of paragraphs 1 through 13 of Count One of this indictment are hereby realleged and incorporated herein as if fully set forth.

2.     On or about December 22, 2008, at Burr Ridge, in the Northern District of Illinois, Eastern Division,

### DOUG ALLEN,

defendant herein, for the purpose of executing the aforesaid scheme, did knowingly cause to be placed in an authorized depository for mail matter, to be sent and delivered by the Postal Service, an envelope addressed to Individual C, at an address in Canton, Georgia, containing an invoice reflecting the sale of a 1887 N175 Large Gypsy Queen King Kelly baseball card;

In violation of Title 18, United States Code, Sections 1341 and 2.

## COUNT SIXTEEN

The SPECIAL FEBRUARY 2011-1 GRAND JURY further charges:

1.    The allegations of paragraph 1 of Count One of this indictment are hereby realleged and incorporated herein as if fully set forth.

2.    Defendant WILLIAM BOEHM was employed by Mastro Auctions and served as its Director of Information Technology.

3.    On or about July 30, 2007, at Kirkwood, Missouri, in an interview being conducted by agents of the Chicago Division of the Federal Bureau of Investigation, in relation to an investigation being conducted in the Northern District of Illinois, Eastern Division, and elsewhere,

WILLIAM BOEHM,

defendant herein, did knowingly and willfully make materially false, fictitious, and fraudulent statements and representations in a matter within the jurisdiction of the Chicago Division of the Federal Bureau of Investigation, an agency within the executive branch of the Government of the United States, in that WILLIAM BOEHM, when interviewed by agents of the Federal Bureau of Investigation, stated in sum and substance that:

a.    BOEHM disabled the Mastro Auctions bidding account of Individual D because Individual D was having financial difficulties; and

b.    BOEHM created a Mastro Auctions bidding account in the name of "Craig Helling" to catch a Mastro Auctions employee suspected of stealing company information;

When in truth and fact, defendant well knew that the accounts in the names of Individual D and Craig Helling were used to place fictitious bids;

In violation of Title 18, United States Code, Section 1001(a)(2).


A TRUE BILL:


_____
FOREPERSON


_____
ACTING UNITED STATES ATTORNEY